UNITED STATES DISTRICT COURT                    ELECTRONIC PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

UNITED STATES OF AMERICA,                                    MEMORANDUM
                                                             AND ORDER
            - versus -                                       08-CR-336 (JG)

DARIN DEMIZIO,

                                    *Defendant*.
------------------------------------------------------------------x
A P P E A R A N C E S :

        LORETTA E. LYNCH
                United States Attorney
                Eastern District of New York
                271 Cadman Plaza East
                Brooklyn, New York 11201
        By:     Winston M. Paes
                *Attorney for the United States*
                *of America*

        SPEARS & IMES LLP
                51 Madison Avenue
                New York, New York 10010
        By:     David Spears
                Charlita Mays
                Christopher W. Dysard
                Michelle Skinner
                *Attorneys for Defendant*

JOHN GLEESON, United States District Judge:

            On remand from the United States Court of Appeals for the Second Circuit, the

defendant Darin DeMizio moves for a judgment of acquittal or, in the alternative, a new trial on

a charge of conspiracy to commit securities fraud or wire fraud, in violation of 18 U.S.C.

§§ 1343, 1346 & 1348–49, in light of the Supreme Court's decision in *Skilling v. United States*,

130 S. Ct. 2896 (2010), which narrowed the scope of fraud premised on the deprivation of

"honest services."  DeMizio also seeks a new trial on a charge that he made a false statement in a

matter within federal jurisdiction, in violation of 18 U.S.C. § 1001(a)(2), on the ground of

prejudicial spillover. For the reasons stated below, DeMizio's motion is denied. DeMizio shall report to the facility designated by the Bureau of Prisons on May 25, 2012, to begin serving his sentence.

BACKGROUND

A.    *The Evidence at Trial*

DeMizio worked for Morgan Stanley & Co., Inc. ("Morgan Stanley") for several years beginning in 1991 and eventually rose to the position of running its domestic securities lending business. Morgan Stanley used various companies to act as "finders," matching borrowers and lenders in order to effect its clients' stock-loan transactions. In exchange for these finder services, the companies received a portion of Morgan Stanley's revenue from the transaction. Through his position at Morgan Stanley, DeMizio was able to steer transactions to particular finders. Over a period of several years, four of these companies regularly paid "finder's fees" to either DeMizio's father, Robert, or brother, Craig, in connection with Morgan Stanley transactions.

At trial, the government presented evidence showing that these "finder's fees" were, in fact, kickbacks. The evidence showed that each company paid substantial fees to Robert or Craig for little or no work. They were willing to do so because DeMizio had agreed to provide a steady stream of business from Morgan Stanley in return.

An employee of Garban Corporates LLC ("Garban") testified that her company paid Robert and Craig in connection with Morgan Stanley transactions even though they performed work on no more than "ten percent" of the trades for which they were paid. Trial Tr. 853, 862–65, 873–75, 898–900. Moreover, with respect to the trades Robert and Craig worked

2

on, they did nothing more than provide a list of securities that Morgan Stanley wanted to trade. *Id.* Garban paid them in order to keep Morgan Stanley's business. *Id.* at 851.

DeMizio approached an employee of another company, Freeman Securities Company, Inc. ("Freeman")*,* and offered to increase Freeman's business with Morgan Stanley. *Id.* at 317. In exchange, Freeman would pay finder's fees to Craig even though Craig "wasn't going to participate in the day-to-day business that much." *Id.* at 318. Freeman thereafter paid Craig $30,000 to $50,000 a month even though Craig performed no more than 20 percent of the actual work on the trades for which he was paid. *Id.* at 332, 329, 403. DeMizio said he "would deny the whole thing" if anybody at Morgan Stanley found out about Freeman's payments to Craig. *Id.* at 339.

DeMizio and another Morgan Stanley employee, Peter Sherlock, set up a similar kickback scheme with Clinton Management Ltd. ("Clinton"). Clinton obtained Morgan Stanley's business and, in return, Clinton paid a portion of its fees on Morgan Stanley transactions to Craig, even though he did not do any work. *See id.* at 635, 637, 726.

DeMizio also steered Morgan Stanley's business to a fourth company, Tyde, Inc. ("Tyde"), founded by DeMizio's best friend, Robert Johnson. DeMizio directed Johnson to pay half of Tyde's fees from trades involving Morgan Stanley to his father, even though he would visit Tyde only "sporadically," and spent his time there socializing on the telephone. *Id.* at 76–78; *see also id.* at 75, 82, 90–91, 138, 140, 228, 236–39, 266–68. Johnson agreed to this arrangement so that Tyde would continue to receive business from Morgan Stanley. *Id.* at 77, 266. Subsequently, DeMizio told Johnson to pay Craig for Morgan Stanley transactions, even though Johnson was doing all of the finder work. *Id.* at 97–99. At the time, Craig was in need of financial help and "was incapable of doing the transactions himself." *Id.* at 98.

In addition to this kickback scheme, DeMizio and Johnson also contemplated several legitimate joint business ventures. *See id.* at 118–19. For example, they formed a modeling agency, Eon Model Management ("Eon"), in 2004. *Id.* at 122–24. DeMizio directed Johnson to use some of the fees that had been going to Robert or Craig to fund Eon. *Id.* at 118–19, 123–24, 144–45, 271. DeMizio was entitled half of any profits earned by Eon. *Id.* at 125.

The government introduced evidence that DeMizio's actions had a negative financial impact on Morgan Stanley. First, DeMizio decreased Morgan Stanley's revenues on particular trades involving Garban, increasing Garban's revenues and, thus, allowing it to pay greater fees to Robert and Craig. *See, e.g.*, *id.* at 862–63, 876–78. Second, on at least one occasion, DeMizio loaned a stock to Tyde at a below market rate, undercutting Morgan Stanley's revenue. *Id.* at 649–52. Third, DeMizio arranged for Tyde to receive a "cold balance," *i.e.*, a steady stream of trades involving easy-to-borrow stocks. *Id.* at 78–79. Providing a cold balance to Tyde was not in Morgan Stanley's interest, as it ordinarily supplied them to large financial institutions, not smaller firms like Tyde. *Id.* at 424–29. DeMizio set Morgan Stanley's portion of the fees from Tyde's cold balance at a rate lower than the industry standard. *Id.* at 79, 429–33, 460–68.

In 2007, DeMizio met with two special agents of the Federal Bureau of Investigation ("FBI") for a voluntary interview. DeMizio told the special agents that he did not have any outside business arrangements with Johnson. *Id.* at 947–48. The government contended that this statement was false because of, *inter alia*, Johnson's and DeMizio's partnership in Eon.

B.      *The Jury Charge and Verdict*

After receiving proposed jury instructions from the parties, I held a charge conference on March 20, 2009. Discussions at the charge conference with respect to two of DeMizio's proposed jury instructions are relevant here.

DeMizio's fifth proposed instruction (relating to the element of a material misrepresentation or omission) described the sole omission at issue in the case as the failure to disclose that DeMizio "was causing finder fees to be paid to his family members in connection with stock-loan transactions involving Morgan Stanley." Def.'s Proposed Jury Instructions 13, ECF No. 105. The government objected to this proposed instruction because, *inter alia*, there was "a variety . . . of . . . material misrepresentations or omissions that the jury could find here." Trial Tr. 1095. DeMizio's counsel, while agreeing to some modification of the language, disagreed. According to him, "steering business to be paid for no work is the omission that . . . we should be focused on. And I'm not aware of anything else in the record that would represent another omission." *Id.* at 1097. In response, the government suggested that

> [a]nother material misrepresentation or omission that the jury
> could find is that Mr. DeMizio was steering business to Garban,
> for example, conditionally; on the condition that his brother or
> father be paid. And so, had his employers knew [*sic*] that he was
> controlling or conditioning order flow for Morgan business . . . on
> the fact that his brother and father were being put on trades, that's
> also a material misrepresentation or omission that the jury could
> find and that his employers would find significant.

*Id.* (paragraph break removed). DeMizio's counsel replied that the government had never raised this theory and that its position from "the outset of the case was that it was about . . . pay for no work." *Id.*

I declined to instruct the jury as to what particular material misrepresentations or omissions might be at issue in this case. *See id.* at 1099. Instead, I told the parties "I would state the general principle and let you argue it out." *Id.*

A second disagreement related to DeMizio's eighth proposed instruction, which related to a purported difference in the standards for two types of fraud premised on the theory that an employee had deprived his employer of the intangible right to honest services: frauds involving the payment of kickbacks and those involving undisclosed self-dealing. *See* Def.'s Proposed Jury Instructions 16. I declined to give this proposed instruction, explaining that "I . . . think that the jury understands, as I do, that the thrust of the Government's case is the paying money . . . to Craig and to Robert . . . for no work. Not that to the extent they actually did work it constitutes a self-dealing. So, I don't think it's an appropriate charge." Trial Tr. 1154. I later elaborated on my decision, explaining that "it seems clear to me, seeing how the case was tried, that the Government hasn't alleged that the defendant steered Morgan Stanley's business to firms in which he had an undisclosed ownership interest." *Id.* at 1385.

After the parties' closing arguments, I charged the jury on March 23, 2009. With respect to the nature of the conspiracy to commit honest services fraud, I simply instructed the jury that "in this case the conspirators allegedly agreed to a scheme that would deprive Morgan Stanley of its rights to the honest services of Darin DeMizio." *Id.* at 1365; *see also id.* at 1366–69, 1372.

The following day, March 24, 2009, the jury returned a verdict, finding DeMizio guilty on both counts of the superseding indictment: conspiracy to commit securities fraud or wire fraud and making a false statement. *Id.* at 1404.

C.      *Post-Trial Proceedings and Appeal*

      1.      *DeMizio's Post-Trial Motion*

In May 2009, DeMizio moved for a judgment of acquittal or, in the alternative, a new trial.[1] DeMizio argued, *inter alia*, that I should have accepted his eighth proposed injury instruction concerning two separate types of honest services fraud – kickbacks and undisclosed self-dealing.

In a July 20, 2009 decision, I denied DeMizio's motion for acquittal or a new trial. *See United States v. DeMizio*, No. 08-CR-336 (JG), 2009 WL 2163099 (E.D.N.Y. July 20, 2009). I held that the requested instruction was properly denied because "there was no evidence in the record to suggest that the defendant steered Morgan Stanley's business to firms in which he had an undisclosed ownership interest," *i.e.*, that there was self-dealing. *Id.* at *3 (emphasis removed).

      2.      *Sentencing*

DeMizio's advisory guidelines range was 108–35 months, but other relevant factors outweighed that consideration and on July 10, 2009, I sentenced him to a term of imprisonment of 38 months on each count, to run concurrently. I subsequently ordered DeMizio to pay $1,200,000 in restitution, finding this to be "a reasonable estimate of the loss, taking into account the possible value of services rendered by Craig and Robert." Order, Nov. 4, 2009.

      3.      *Motion for Bail Pending Appeal*

DeMizio appealed to the Second Circuit. In December 2009, he moved in this Court for his release on bail pending appeal. In support of his bail application, DeMizio

---

[1]      DeMizio had previously moved for a judgment of acquittal both at the close of the government's case-in-chief and at the close of all the evidence. The motions were denied.

referenced three then-pending cases in the Supreme Court concerning the scope of honest services fraud, including *Skilling v. United States*, 130 S. Ct. 2896 (2010). DeMizio argued that the outcome of those cases would likely require that his conviction be set aside.

I denied bail pending appeal, explaining that the pending Supreme Court cases were "unlikely to assist a convicted defendant where, as here, the fraudulent scheme at issue involved kickbacks paid at the defendant's direction." Order, Dec. 22, 2009, at 1, ECF No. 147. The Second Circuit reversed the denial of bail pending appeal on January 21, 2010.

4. *The* Skilling *Decision and Subsequent Remand of This Case*

On June 24, 2010, while DeMizio's appeal of his conviction remained pending, the Supreme Court issued its decision in *Skilling*. The Court addressed 18 U.S.C. § 1346, which provides that federal fraud offenses include "a scheme or artifice to deprive another of the intangible right of honest services." *Id.* As explained below, the Supreme Court narrowed the scope of honest services fraud to "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." *Skilling*, 130 S. Ct. at 2928.

On October 20, 2011, the Second Circuit dismissed DeMizio's appeal without prejudice and remanded the case in order for this Court to "consider, in the first instance, the effect of *Skilling*." Corrected Order, *United States v. DeMizio*, No. 09-3463-cr (2d Cir. Oct. 20, 2011), ECF No. 151. I subsequently directed the parties to file supplemental briefing on *Skilling*'s effect on this case and held oral argument on December 9, 2011.

DISCUSSION

A.      *Sufficiency of the Evidence*

        1.      *Standard of Review*

                In addressing a challenge to the sufficiency of the evidence, a court must "view

the evidence in the light most favorable to the verdict" and set aside the conviction only if "no

reasonable jury could have found guilt beyond a reasonable doubt." *United States v. Coppola*,

--- F.3d ----, No. 10-0065-cr, 2012 WL 456514, at *7 (2d Cir. Feb. 14, 2012); *see also United*

*States v. Bruno*, 661 F.3d 733, 743 (2d Cir. 2011); *United States v. Bahel*, 662 F.3d 610, 639 (2d

Cir. 2011); *United States v. Al Kassar*, 660 F.3d 108, 128 (2d Cir.) (standard for assessing

sufficiency of the evidence requires "viewing the evidence in the light most favorable to the

government, drawing all reasonable inferences in the government's favor, and resolving all

questions of credibility in the government's favor"), *petition for cert. filed*, No. 11-784 (U.S.

Dec. 19, 2011).

        2.      *The Impact of* Skilling

                *Skilling* addressed a void-for-vagueness challenge to the term "the intangible right

of honest services" in § 1346.  The Court concluded that the term was unconstitutionally vague,

but determined that the statute should be construed to provide the requisite clarity rather than

invalidated.  *Skilling*, 130 S. Ct. at 2928.  The Court then looked to the history of § 1346 to craft

a limiting construction that would best preserve the statute's purposes.  *See id.* at 2928–29, 2933.

                Section 1346 was enacted in response to *McNally v. United States*, 483 U.S. 350

(1987), which held that federal antifraud statutes applied only to schemes that resulted in the

deprivation of property rights.  *See id.* at 358–61.  In so holding, the Court rejected a substantial

body of case law that had held that fraud offenses included the deprivation of intangible rights

such as an employer's right to its employees' honest services. *See Skilling*, 130 S. Ct. at 2926–27.[2]  Congress responded to *McNally* with § 1346, which provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."  18 U.S.C. § 1346; *see also Skilling*, 130 S. Ct. at 2927 (explaining that § 1346 was enacted "specifically to cover one of the 'intangible rights' that lower courts had protected . . . prior to *McNally*: 'the intangible right of honest services.'" (quoting *Cleveland v. United States*, 531 U.S. 12, 19–20 (2000)) (alteration in *Skilling*) (other internal quotation marks omitted)).

   *Skilling* sought to preserve Congress's effort "to reinstate the body of pre-*McNally* honest-services law," *Skilling*, 130 S. Ct. at 2929 (internal quotation marks and citation omitted), while eliminating the vagueness of the term "honest services."  *See id.* at 2933.  The Court rejected some theories of honest services fraud that many lower courts had accepted, such as undisclosed self-dealing or conflicts of interest, because the scope of such theories could not be defined with sufficient precision.  *See id.* at 2932–33.  It instead limited honest services fraud to its "core pre-*McNally* applications," *id.* at 2931, which involved "fraudulent schemes to deprive another of honest services through *bribes or kickbacks* supplied by a third party who had not been deceived," *id.* at 2928 (emphasis added); *see also Bahel*, 662 F.3d at 622 ("[H]onest services fraud under Section 1346 is limited to a bribery and kickback 'core,' and thus does not include undisclosed conflicts of interest . . . .").  The Court concluded that, "[c]onfined to these paramount applications, § 1346 presents no vagueness problem."  *Skilling*, 130 S. Ct. at 2928.

---

    [2]  *See also McNally*, 438 U.S. at 376 (Stevens, J., dissenting) ("Perhaps the most distressing aspect of the Court's action today is its casual – almost summary – rejection of the accumulated wisdom of the many distinguished federal judges who have thoughtfully considered and correctly answered the question these cases present.  The quality of this Court's work is most suspect when it stands alone, or virtually so, against a tide of well-considered opinions issued by state or federal courts.").

DeMizio's specific arguments regarding the sufficiency of the evidence in light of *Skilling* are based largely on a common premise: that the "core" preserved by *Skilling* is limited to particular fact patterns involving bribes or kickbacks that were recognized by pre-*McNally* case law. DeMizio further argues that the pre-*McNally* core is further confined to other cases involving fraud in the private sector, since private- and public-sector fraud cases involve substantially different concerns.

I disagree that a prosecution for honest services fraud can go forward only if the particular type of bribery or kickback scheme alleged falls within the factual contours of the pre-*McNally* cases. "*Skilling* did not eliminate from the definition of honest services fraud any particular type of bribery [or kickbacks], but simply eliminated honest services fraud theories that go beyond bribery and kickbacks." *United States v. Bryant*, 655 F.3d 232, 245 (3d Cir. 2011); *see also, e.g.*, *Bahel*, 662 F.3d at 632 ("[*Skilling*] stands for the proposition that fraud actionable under Section 1346 is limited to the nature of the offenses prosecuted in the pre-*McNally* cases (i.e., bribery and kickback schemes) – not the identity of the actors involved in those cases."); *United States v. Scanlon*, 753 F. Supp. 2d 23, 26 (D.D.C. 2010) ("[*Skilling*] used the term 'core' not . . . to distinguish 'core bribe-and-kickback' cases from 'non-core bribe-and-kickback cases,' but rather to distinguish bribery and kickback cases (which *themselves constitute* the 'core' of pre-*McNally* case law) from cases involving mere undisclosed self-dealing."), *aff'd on other grounds*, 666 F.3d 796 (D.C. Cir. 2012). Indeed, the *Skilling* Court explained that the scope of the prohibition of bribery and kickback schemes "draws content *not only* from the pre-*McNally* case law, *but also from federal statutes proscribing – and defining – similar crimes*." *Skilling*, 130 S. Ct. at 2933 (emphasis added). In short, if a scheme involves

bribery or kickbacks, as those terms are defined with reference to all appropriate federal legal sources, then it may be prosecuted as honest services fraud under *Skilling*.

Moreover, the rationale of *Skilling* – avoiding unconstitutional vagueness – does not require limiting actionable honest services fraud to pre-*McNally* fact patterns.  "[T]he void-for-vagueness doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions."  *Id.*  Vagueness concerns do not require that a person be able to analogize his conduct to that at issue in a pre-*McNally* case to determine if he is committing honest services fraud.  It will be "reasonably clear . . . that the defendant's conduct was criminal," *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir.) (quoting *United States v. Lanier*, 520 U.S. 259, 267 (1997)) (internal quotation marks omitted), *cert. denied*, 131 S. Ct. 611 (2010), as long as the defendant's conduct involves a bribery or kickback scheme, of whatever kind.  Bribery and kickback schemes may take many forms, and the void-for-vagueness doctrine does not require a catalog of the various types.

Indeed, the analysis urged by DeMizio would effectively freeze honest services fraud in its pre-*McNally* state.  Novel bribery and kickback schemes that have no pre-*McNally* counterpart would be beyond the reach of the federal antifraud statutes.  Nothing in *Skilling* or its reasoning supports this result.

Thus, in addressing DeMizio's arguments below, I need not search for pre-*McNally* cases that match the factual contours of the government's case against DeMizio.  Instead, I will examine whether the government presented sufficient evidence that DeMizio's conduct involved kickbacks, as that term is properly understood, while keeping in mind any potential vagueness concerns.

3.      *Analysis*

DeMizio identifies three purported deficiencies in the government's evidence that require a judgment of acquittal in light of *Skilling*.  He argues that the government was required, but failed, to prove:  (1) that Robert and Craig did not perform any legitimate work in exchange for the purported kickbacks; (2) that one or more of the payments for Robert or Craig went to DeMizio personally; and (3) that Morgan Stanley was unaware of DeMizio's purportedly fraudulent dealings.

As explained below, in an honest services fraud case post-*Skilling*, the government is not required to prove that the recipient of a purported kickback performed no legitimate work in exchange for it or that the victim's employee personally received kickback money.  I also conclude that the government presented sufficient evidence that Morgan Stanley was unaware of DeMizio's kickback scheme.  Accordingly, I deny DeMizio's motion insofar as he seeks a judgment of acquittal.

a.      *Whether the Government Must Prove That a Recipient of an Alleged Kickback Performed No Work in Exchange for It*

"In . . . bribery or kickback cases, a defendant who has or seeks some sort of business relationship or transaction with the victim secretly pays the victim's employee (or causes such a payment to be made) in exchange for favored treatment."  *United States v. Rybicki*, 354 F.3d 124, 139 (2d Cir. 2003) (en banc); *see also Bahel*, 662 F.3d at 634; *United States v. Pelisamen*, 641 F.3d 399, 405 (9th Cir. 2011).  A kickback can take many forms; under the federal Anti-Kickback Act, it is broadly defined as "*any* money, fee, commission, credit, gift, gratuity, thing of value, or compensation *of any kind* that is provided to [enumerated persons] to improperly obtain or reward favorable treatment."  41 U.S.C. § 8701(2) (emphasis added).

Given this broad definition, I conclude that a kickback may consist of a payment that is partly for legitimate work and partly for some favorable action. While the portion compensating the recipient for actual work performed is legitimate, any excess payment may be a kickback if it is exchanged for favorable treatment. *Cf. United States v. McClatchey*, 316 F.3d 1122, 1129–30 (10th Cir. 2003) (affirming finding, for sentencing purposes, that $150,000 payment in exchange for work valued at $100,000 amounted to a $50,000 bribe).

Case law bears out the notion that the performance of a modicum of work does not automatically transform a kickback or a bribe into a legitimate payment. In *Bryant*, the Third Circuit held that a jury may find a bribery scheme existed where the recipient has performed some legitimate services in exchange for benefits received. *See* 655 F.3d at 245–46 (affirming jury instruction that "allowed for conviction on the honest services fraud counts even if the jury believed [the person paying a bribe] was *partially motivated to pay [the recipient] for some legitimate work* as well as his official action" (emphasis added)); *see also id.* at 243 & n.10. The First Circuit took the same view, affirming a conviction for honest services fraud post-*Skilling* even though the recipient of the alleged kickbacks, a state senator, was paid in part for performing "some marketing services." *United States v. Urciuoli*, 613 F.3d 11, 14 (1st Cir.), *cert. denied*, 131 S. Ct. 612 (2010). The evidence permitted an inference that the senator's work "was *modest given his ample salary*" and that the payments were "*primarily* intended . . . to secure [his] legislative help." *Id.* (emphasis added). Similarly, in *United States v. Bruno*, 661 F.3d 733 (2d Cir. 2011), the Second Circuit held there was sufficient evidence to support an honest services fraud conviction where the jury could reasonably infer that the defendant "performed *virtually* non-existent consulting work for substantial payments." *Id.* at 744 (emphasis added).

As the Third Circuit explained, the consequences of the rule urged by DeMizio "would be untenable." *Bryant*, 655 F.3d at 246. Potential fraudsters could shield themselves from criminal liability merely by performing some token labor in exchange for what would otherwise be an illegal kickback. *See id.* ("[A] payor could bribe [or pay kickbacks to] an official with impunity, intending to influence official action and vice versa, provided that the payor had some additional hope, however small, of receiving legitimate work in return."). It would be irrational to hold that honest services fraud turns on such a technicality.

Contrary to DeMizio's arguments, nothing in *Skilling* suggests that a benefit provided in exchange partially for legitimate work and partially for illegitimate favor is not a kickback. *See id.* at 245–46. As noted above, the *Skilling* court was concerned with whether § 1346 provided "fair notice" of the conduct it proscribed as well as the risk of "arbitrary and discriminatory prosecutions." *Skilling*, 130 S. Ct. at 2933. These concerns do not require limiting honest services fraud to the undisclosed receipt of payments for no work. A payment of $101 for $1 worth of work is just as clearly a kickback as a payment of $100 for no work. And, as the *Skilling* Court noted, "[t]he statute's *mens rea* requirement further blunts any notice concern." *Id.* The statute requires *intentionally* exchanging favorable treatment from an employer for personal gain, so there can be no reasonable fear of liability simply for being overcompensated for legitimate labor. Similarly, there is no significant risk of arbitrary prosecutions. *See id.* at 2933–34.

Nor does the fact that this case involves honest services fraud in the private sector require proof that the payments were in exchange for no work. The different concerns at issue with fraud in the public sector may warrant some legal distinctions between private- and public-

sector fraud.[3]  But any such differences do not require a different rule regarding what constitutes

a bribe or a kickback.  Grossly excessive payments in exchange for a small amount of actual

work can constitute kickbacks in the private sector as much as in the public sector.  *Cf. Bahel*,

662 F.3d at 632 ("the identity of the actors involved" is irrelevant to the existence of a bribery or

kickback scheme post-*Skilling*).

      Here, there was ample evidence from which a reasonable jury could have inferred

that the payments to Robert and Craig were kickbacks.  They performed work on no more than

10 to 20 percent of the transactions for which they were paid.  The work they did perform was of

minimal quality and difficulty, and there was even evidence that they were not competent to

perform work as finders.  In exchange for this "work," they received in excess of $1.5 million in

payments.  While DeMizio was free to argue to the jury that these payments were in exchange

for legitimate work, the jury reasonably found otherwise.  *See Bryant*, 655 F.3d at 243 n.10;

*Urciuoli*, 613 F.3d at 15.[4]

      Moreover, even if some of the payments to Robert and Craig were for work they

actually performed, there was overwhelming evidence that Robert and Craig were frequently

paid for particular transactions for which they did no work whatsoever.  *See, e.g.*, Trial Tr. 75–

---

[3]     One such distinction might be a stricter materiality standard in private-sector cases – a private employer might be less concerned with its employees' receipt of kickbacks than a public one if there is no clear economic harm or risk of harm to the employer.  *See United States v. deVegter*, 198 F.3d 1324, 1330 (11th Cir. 1999) (holding that "a *private* sector violation of § 1346 honest services fraud involves a breach of a fiduciary duty *and reasonably foreseeable economic harm*" (emphasis added)); *see also Rybicki*, 354 F.3d at 146 (discussing and adopting materiality standard in private-sector § 1346 cases and noting it will capture both economic or pecuniary harm as well as "some cases of non-economic, yet serious, harm in the private sphere").

[4]     DeMizio argues that the government limited its case to the theory that Robert and Craig were paid in exchange for no work.  On this basis, he contends that an "alternative theory . . . that although Robert and Craig did some work, the payments exceeded the value of the work performed and therefore still constituted kickbacks" would constitute a constructive amendment of the indictment, in violation of the Fifth Amendment.  Def.'s Mem. of Law 20 n.8, ECF No. 152.  I disagree.  The superseding indictment alleges that DeMizio arranged for kickbacks to be paid to his relatives "*without regard* to whether [they] had performed any legitimate finder services."  Superseding Indictment ¶ 10, ECF No. 71 (emphasis added).  I conclude this allegation is broad enough to encompass a theory that Robert and Craig were paid kickbacks even if they performed some work.  Thus, there was no constructive amendment of the indictment.  *See United v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005).

76, 82, 90–91, 97, 138, 140, 266, 635–37, 726, 865, 873–74.  The government did not have to prove that every single payment to Craig and Robert was a kickback.  In fact, since this was a conspiracy case, the government did not have to prove that there were *any* kickbacks.  In any event, a reasonable jury could have inferred that a substantial percentage of the payments to Robert and Craig constituted kickbacks, even under DeMizio's theory.

b.      *Whether the Government Must Prove That a Defendant Personally Received Payments as Part of an Alleged Kickback Scheme*

DeMizio next argues that the evidence was insufficient because there was no evidence that any of the payments for Robert or Craig were ever transferred to him or used for his benefit. [5]  He argues that an employee of the victim must personally benefit from a charged kickback scheme in order for it to constitute honest services fraud post-*Skilling*, at least in private-sector cases.

I reject this argument for two reasons:  First, I conclude that there is no requirement that a defendant-employee personally benefit in order to commit honest services fraud.  Second, even if there were such a personal-benefit requirement, a reasonable jury could have found that DeMizio benefitted indirectly from the payments to his family members.

---

[5]      The government argues that there was evidence that DeMizio personally profited from the kickback scheme because some of the proceeds were used to fund his business ventures with Johnson.  While I need not address this argument since I resolve the issue on other grounds, I note that evidence regarding DeMizio's and Johnson's business ventures was admitted "solely for the limited purpose of showing whether or not the defendant had outside business dealings with Robert Johnson in connection with [the false statement charge]" and I instructed the jury that it "should consider that evidence solely for that purpose." *Id.* at 1376.

The government also asserts that there was evidence that Craig gave some of his kickback proceeds to DeMizio, *see* Gov't Mem. of Law 23 n.4, ECF No. 153 (citing Trial Tr. 640), but I conclude that this evidence was insufficient.  The government cites testimony that DeMizio recommended to Sherlock that he invest his kickback proceeds in comic books.  *See* Trial Tr. 639.  Based solely on this recommendation and the fact that DeMizio owned a large comic book collection, Sherlock testified that he believed this statement indicated that DeMizio had used kickback money he received from Craig to purchase comic books.  *See id.* at 640.  While this may have been Sherlock's belief as to what DeMizio meant, a reasonable jury could not have inferred from a recommendation to purchase comic books that DeMizio had received kickback proceeds from his brother.

A bribe or a kickback in this context is a payment (or other benefit) given in exchange for an employee's provision of influence or favorable treatment from his employer. What makes a payment a bribe or a kickback is this exchange of payment for influence. *See Bahel*, 662 F.3d at 634 ("In *Skilling*, the Supreme Court defined classic kickbacks as involving the receipt of something of value from a third party '*in exchange for*' official action." (quoting *Skilling*, 130 S. Ct. at 2926) (emphasis in *Bahel*)); *Rybicki*, 354 F.3d at 139 (bribery and kickback schemes involve benefits "in exchange for favored treatment"); *see also Pelisamen*, 641 F.3d at 405 ("[T]he paradigmatic kickback is made 'for the purpose of improperly obtaining or rewarding favorable treatment' in some area . . . ." (citation omitted)). The receipt of payments by the employee personally is unnecessary for this improper exchange to occur – the employer "is deprived of its servants' honest services no matter who receives the proceeds." *United States v. Spano*, 421 F.3d 599, 603 (7th Cir. 2005).

To be sure, most employees would agree to such an exchange only if they or someone they care about were receiving the payments. For example, DeMizio would not have steered Morgan Stanley's business to finders if they made payments for no work to complete strangers. In those circumstances the payments would not be kickbacks, not because they were made to third parties, but because there would have been no improper exchange. In other words, the benefits a defendant receives provide the motive for the fraud, but they are not an element of the crime itself. *See Lombardo v. United States*, 865 F.2d 155, 160 (7th Cir. 1989) ("Admittedly, most schemes to defraud are designed to benefit the schemers personally. This does not transform the characteristic of personal pecuniary benefit into an element of the crime . . . .").

Even if proof that DeMizio personally benefited was required, a reasonably jury could have found he benefitted from payments to his close family members. Many courts have

(at least implicitly) recognized that payments to a person's family member may constitute a bribe or a kickback. *See, e.g., United States v. McNair*, 605 F.3d 1152, 1198 (11th Cir. 2010) (evidence was sufficient to permit finding that payment of scholarship to son in exchange for favor from father constituted a bribe), *cert. denied*, 131 S. Ct. 1599 (2011); *Ryan v. United States*, 759 F. Supp. 2d 975, 997 (N.D. Ill. 2010) (refusing to set aside honest services fraud conviction involving bribery scheme that included "favorable construction and insurance benefits to [the defendant's] family members; investments in [his] son's business; and favorable financial treatment of . . . a business involving [his] brother"), *aff'd*, 645 F.3d 913 (7th Cir.), *petition for cert. filed*, No. 11-499 (U.S. Oct. 19, 2011); *cf. United States v. Romanini*, No. 1:10CR416, 2011 WL 2470158, at *6 (N.D. Ohio June 20, 2011) (rejecting argument at sentencing that defendant's "bribes were effectively selfless acts" because they were attempts to secure jobs for family and friends and he personally received nothing in return). *But cf. Aydin Corp. v. RGB Sales*, Civ. A. No. 89-8084, 1991 WL 152465, at *5 (E.D. Pa. Aug. 5, 1991) (stating that paying employee's wife, purportedly in exchange for employee's favorable influence of employer's conduct "does not violate the [Pennsylvania] bribery statute, as [the wife] was not an employee, agent or fiduciary of [her husband's employer], and [the employer] has produced no evidence showing that the money paid to [the wife] ended up in the hands of her husband"), *aff'd mem.*, 983 F.2d 1049 (3d Cir. 1992).[6] Although none of these cases squarely addressed the question, they reflect

---

[6]      DeMizio cites *United States v. Jiminez*, No. 8:11-cr-197-T-24 TGW, 2011 WL 3652773 (M.D. Fla. Aug. 19, 2011), for the proposition that payments to a defendant's wife do not constitute kickbacks absent evidence that at least some of the money was transferred to the defendant. *See id.* at *2. However, the scheme alleged in *Jiminez* was that the defendant husband had arranged for his employer to purchase copies of his wife's book. *See id.* at *1. The payments his wife received were in exchange for the books and thus could not constitute kickbacks. Absent evidence that the wife gave money to her husband to obtain the employer's book purchases, the husband merely "had a conflict of interest and/or engaged in undisclosed self-dealing with respect to the sale of his wife's book," which "is not enough to sustain a conviction for honest services mail fraud." *Id.* at *3. Similarly, had DeMizio merely provided Morgan Stanley's business to companies owned by his father or brother, he would not have committed honest services fraud under *Skilling* unless his father or brother made payments in exchange for the business. However, the evidence at trial showed that third parties had made payments to Robert and Craig in

the intuitive view that a benefit conferred on a person's close family member may be used to improperly obtain influence as much as a direct payment.

The benefit to a person from payments to a relative may be indirect, but those payments constitute kickbacks nonetheless. A kickback consists of something of value "which is provided, *directly or indirectly*," to a recipient for an improper purpose. *Skilling*, 130 S. Ct. at 2934 (quoting 41 U.S.C. § 52(2) (2006)) (emphasis added) (internal quotation marks omitted).[7] When a person receives payments personally in exchange for providing favorable treatment from his employer, he has obviously received kickbacks. But if there is a sufficiently close relationship between a third party receiving payments and the person whose influence is sought, that person benefits indirectly. *See United States v. McGregor*, No. 2:10cr186-MHT, 2011 WL 1576950, at *4 (M.D. Ala. Apr. 4, 2011) (holding that honest services fraud requires proof of a personal benefit to the offender, but that "the benefit would not have to be in the form of a direct payment of cash to the individual in question" and could instead be a payment to a third party), *report and recommendation adopted as modified by* 2011 WL 1988363 (M.D. Ala. May 23, 2011). Such payments to third parties therefore constitute kickbacks.

Here, for example, the jury could have reasonably concluded that DeMizio benefited indirectly from the payments to his father and brother because he would otherwise have had to support them financially. By instead arranging for them to obtain substantial payments for little or no work, "he relieved himself of the obligation to assist the individuals

exchange for Morgan Stanley's business. This evidence established a classic kickback scheme, albeit one involving indirect benefits to DeMizio through his relatives.

[7]    As DeMizio correctly observes in his brief, the provision quoted in *Skilling*, 41 U.S.C. § 52(2), was recently recodified as 41 U.S.C. § 8701 and amended to eliminate the words "directly or indirectly" from the definition of a kickback. *See* An Act To Enact Certain Laws Relating to Public Contracts as Title 41, United States Code, "Public Contracts," Pub. L. No. 111-350, § 3, 124 Stat. 3677, 3838 (2011). However, the legislative history indicates that these words were "omitted as unnecessary." H.R. Rep. No. 111-42, at 84 (2009). Thus, the amendment does not imply that indirect benefits no longer constitute kickbacks, but only that it was unnecessary to expressly include indirect benefits in the definition of a kickback.

using his own wealth." *Romanini*, 2011 WL 2470158, at *6. Indeed, there was evidence at trial that this was DeMizio's motive in setting up the kickback scheme. *See, e.g.*, Trial Tr. 603–04 (testimony that DeMizio complained his father asking him for money); *see also id.* at 98 (testimony that DeMizio asked for kickbacks to be paid to his brother and because he "wasn't making a lot of money at that time, and he needed help"); *id.* at 114.

As with DeMizio's arguments addressed in the preceding section, neither *Skilling* nor the fact that this is a private-sector fraud case impact my conclusion that the evidence at trial was sufficient. With respect to *Skilling*, the vagueness concerns at issue there do not require a rule that only payments to an employee personally can constitute kickbacks. It is clear that an employee who intentionally influences his employer's conduct in exchange for payments to a third party has violated the law as much as one who does so in exchange for payments to himself. And the *Skilling* Court cited with approval statutory language that expressly included *indirect* benefits in the definition of a kickback. *See Skilling*, 130 S. Ct. at 2933–34 (quoting 41 U.S.C. § 52(2) (2006)). With respect to private-sector fraud, kickbacks to a private employee's relatives are a legitimate concern just as kickbacks to a public employee's relatives are. DeMizio has put forward no compelling reason to draw a distinction between private- and public-sector cases based on the identity of a kickback's recipient.

      c.      *Whether There Was Sufficient Evidence That the Fraud Victim Was Unaware of the Alleged Kickback Scheme*

The parties agree that the government had to prove that the victim, Morgan Stanley, was unaware of the alleged kickback scheme. Otherwise there would not have been any fraudulent omission. However, the parties disagree sharply as to whether the evidence on this point was sufficient. DeMizio argues that "[e]very aspect of Robert's dealings through Tyde was known to" Morgan Stanley and that one of DeMizio's "peer[s]" at Morgan Stanley was aware of

Craig's dealings with Clinton.  Def.'s Mem. of Law 23–24, ECF No. 152.  The government

argues that it presented sufficient evidence that DeMizio concealed the kickback scheme from

Morgan Stanley.

I agree with the government that there was sufficient evidence for the jury to have

found beyond a reasonable doubt that Morgan Stanley was unaware of the kickback scheme.  In

particular, there was evidence that DeMizio sought to hide the scheme from Morgan Stanley and

others.  Peter Sherlock, who worked under DeMizio at Morgan Stanley, testified that DeMizio

told him not to tell Morgan Stanley's attorneys about Craig's arrangement with Clinton and that

the two of them met and coordinated the answers they gave to the attorneys during interviews.

*See* Trial Tr. 693–95, 697–98.  Other witnesses testified that DeMizio was concerned about

people discovering the payments Craig was receiving and that DeMizio said "he would deny the

whole thing" if anyone found out.  *Id.* at 339; *see also id.* at 154–55 (testimony that DeMizio had

suggested that Johnson destroy Tyde's trading records after the FBI had begun its investigation).

There was also evidence that DeMizio used coded language to discuss the dealings with Robert

and Craig to prevent anyone from discovering the scheme.  *See id.* at 98–99.  If Morgan Stanley

was aware of the payments to Robert and Craig, DeMizio would not have been concerned about

hiding them.  Thus, a reasonable jury could infer from DeMizio's efforts to conceal the scheme

that Morgan Stanley was not aware of it.  *See Bahel*, 662 F.3d at 640.

DeMizio argues that there was evidence at trial showing that Morgan Stanley was

aware of his arrangements with finders who were paying Robert and Craig.  First, he cites

Johnson's testimony that others at Morgan Stanley, including DeMizio's supervisor, were aware

of Robert's employment at Tyde and his receipt of a cold balance.  *See* Trial Tr. 227–28, 231,

235.  But Johnson also testified that he never told any of DeMizio's supervisors that he was

paying kickbacks to Robert or Craig. *See id.* at 269. Second, DeMizio cites Sherlock's testimony that a "peer" of DeMizio at Morgan Stanley, Mike Manzino, knew of the payments being made to Craig by Clinton. *See* Def.'s Mem. of Law 24 (citing Trial Tr. 629–30, 727–28). But Sherlock testified that DeMizio was Manzino's *boss*, not his peer, and DeMizio told him about the kickback scheme only because his acquiescence was necessary for the scheme's successful execution. *See* Trial Tr. 629–30, 729–30.

At best, the evidence supports an inference that some Morgan Stanley employees may have been aware of certain aspects of DeMizio's arrangements with companies that were paying Robert and Craig finder's fees. But there is no evidence that anyone whose knowledge may be imputed to Morgan Stanley was aware of the kickback scheme.

B.    *Whether the Erroneous Jury Instruction on Honest Services Fraud Requires a New Trial*

1.    *Standard of Review*

The parties agree that the jury instructions were erroneous in light of *Skilling* and that harmless error analysis applies. *See Neder v. United States*, 527 U.S. 1, 10 (1999); *see also Skilling*, 130 S. Ct. at 2934. When reviewing for harmless error, a conviction should not be set aside if the reviewing court can "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." *Neder*, 527 U.S. at 19; *see also United States v. Coppola*, --- F.3d ----, No. 10-0065-cr, 2012 WL 456514, at *21 (2d Cir. Feb. 14, 2012).

2.    *Analysis*

DeMizio argues that the error in the jury instruction was not harmless because a reasonable jury might have found him guilty him on the theory that he was steering Morgan Stanley's business to firms that employed his brother or father. He argues the jury might have believed that the payments to Robert and Craig were in exchange for legitimate work, but

returned a guilty verdict nonetheless on a theory of "self-dealing" or an undisclosed conflict of interest – grounds for conviction that are undisputedly invalid under *Skilling*.

The key problem with DeMizio's argument is that only one theory of guilt was presented and argued to the jury – DeMizio's participation in a scheme to obtain kickbacks, paid to his father or brother, from companies in exchange for receipt of his employer's lucrative securities-lending business. In returning a verdict of guilty, the jury necessarily accepted this theory.

This is *not* a case in which "the jury was instructed on alternative theories of guilt and may have relied on an invalid one." *Hedgpeth v. Pulido*, 129 S. Ct. 530, 530 (2008) (per curiam). While the government initially suggested that the jury should be instructed that it could find DeMizio guilty if either there was a kickback scheme *or* DeMizio had steered business to firms that employed his relatives, I declined to instruct the jury on these alternative theories. Instead, I decided to "state the general principle and let [the parties] argue it out" during their closing arguments. Trial Tr. 1099; *see also id.* at 1152. And the government then argued only one theory to the jury – that DeMizio had participated in a kickback scheme.

I also rejected DeMizio's request to instruct the jury on self-dealing because "the jury understands, as I do, that the thrust of the Government's case is the paying of money . . . to Craig and to Robert . . . for no work. *Not that to the extent they actually did work it constitutes a self-dealing.*" *Id.* at 1154 (emphasis added); *see also id.* at 1385. "DeMizio was not entitled to an instruction along these lines because he failed to identify any evidence in the record that could permit a jury to find that this was a self-dealing case." *United States v. DeMizio*, No. 08-CR-336 (JG), 2009 WL 2163099, at *1 (E.D.N.Y. July 20, 2009).

While the issue now arises in a different context, I adhere to my prior rulings that this was purely a kickback case. From the opening statements, the government presented the case as one involving a kickback scheme. *See, e.g.*, Trial Tr. 11 (DeMizio told "firms to pay his father and brother, even though they *did no work to earn that money*" (emphasis added)); *id.* (DeMizio "abused his power, betrayed that trust, and used people who he trusted to *pay kickbacks* to his father and brother" (emphasis added)); *id.* ("[W]e will prove to you that the defendant is guilty beyond a reasonable doubt *of the kickback scheme* that I just described to you." (emphasis added)).[8] The government's evidence consistently showed that, in exchange for business from Morgan Stanley, Robert and Craig received payments for little or no actual work *i.e.*, kickbacks – not that DeMizio was steering business to companies that legitimately employed his relatives. And during its summation, the government consistently referred to the charged fraud as a kickback scheme. *See, e.g.*, *id.* at 1156 ("[T]his is a simple case. And it is. *It's a case about kickbacks*. Right? You know that. You've sat here for the week and *you know that this is a case about kickbacks*." (emphasis added)); *see also, e.g.*, *id.* at 1164, 1166–67, 1185, 1195, 1197, 1209, 1219–21, 1294, 1299, 1314, 1324–26, 1335–36, 1349.

In short, the jury was never instructed that it could find DeMizio guilty on the basis of undisclosed self-dealing or any other impermissible theory. The government presented evidence and consistently argued that the honest services fraud here consisted of the payment of kickbacks. Neither the Court nor the government ever told the jury about an alternative theory of

---

[8] Indeed, at the charge conference, DeMizio's counsel emphasized that the government's sole theory of fraud in its opening statement was premised on a kickback scheme:

> I note that the position the Government took at the outset of the case was that it was about no, you know, *pay for no work*. I mean that's what they opened on and they said it 12 times or nine times in opening. And *this other omission . . . was not raised*.

Trial Tr. 1097–98 (emphasis added); *see also id.* at 1097 (DeMizio's counsel's statement that "steering business to be paid for no work is the omission that . . . we should be focused on. *And I'm not aware of anything else in the record that would represent another omission*." (emphasis added)).

undisclosed self-dealing or conflicts of interest.  While the government might have chosen to present an alternative theory, it based its case solely on a kickback theory.

DeMizio argues that the government argued to the jury that it could find him guilty "merely because he had not been forthright with his employer."  Def.'s Mem. of Law 27. While the government did argue that DeMizio had not been honest with Morgan Stanley, that argument was entirely consistent with a kickback theory.  As DeMizio himself has correctly argued in connection with this motion, his conviction could not stand if Morgan Stanley had been aware of the kickbacks.  All fraud cases, including honest services fraud, necessarily involve dishonesty.  In the context of this trial, statements by the government such as "Darin DeMizio wasn't telling Morgan Stanley everything," Trial Tr. 1321, or that "he wasn't telling Morgan Stanley what's going on," *id.* at 1350, did not suggest to the jury that they should find DeMizio guilty merely for being dishonest.  Rather, these statements urged the jury to find him guilty for being dishonest *about the kickbacks*.

At bottom, the jury was presented with two factual theories:  DeMizio's argument that the payments to Robert and Craig were for legitimate work and the government's argument that the payments were, instead, kickbacks made to improperly obtain Morgan Stanley's business.  If the jury had found that the government had failed to prove its theory beyond a reasonable doubt, then it would have returned a verdict of not guilty.  The fact that it returned a guilty verdict reflects that it agreed with the government beyond a reasonable doubt that the payments were kickbacks.  A third theory – the payments were not kickbacks, but DeMizio was still guilty of honest services fraud – was never presented or suggested to the jury.  I conclude beyond a reasonable doubt that the jury did not, without guidance or suggestion from the Court

or counsel, invent a theory of DeMizio's guilt premised on undisclosed self-dealing or some other impermissible ground.[9]

This conclusion is in accordance with decisions that have held *Skilling* errors were harmless where the trial evidence and arguments focused exclusively on bribery or kickbacks. In these cases, even though jurors were not expressly instructed that honest services fraud is limited to bribery or kickback schemes, there was nothing in the record to suggest that the jury's verdict might have been based on anything else. *See United States v. Barraza*, 655 F.3d 375, 382–83 (5th Cir. 2011) (failure to charge on need for bribery or kickback harmless where arguments and evidence focused on bribery rather than conflict-of-interest theory foreclosed by *Skilling*), *cert. denied*, No. 11-8104, 2012 WL 538669 (U.S. Feb. 21, 2012); *United States v. Botti*, 722 F. Supp. 2d 207, 216–17 (D. Conn. 2010) (since indictment, evidence, jury charge, verdict form and argument did not specify a theory of guilt other than bribery, to conclude that jury found the defendant guilty on some other theory "would require pure speculation on the Court's part, and an assumption that the jury acted in an unreasonable manner in contriving some grounds for conviction other than the obvious one clearly supported by the record"), *appeal docketed*, No. 10-3891 (2d Cir. Sept. 27, 2010); *see also United States v. Cantrell*, 617 F.3d 919, 921 (7th Cir. 2010) (because the charged scheme "was clearly a kickback scheme, . . . § 1346 – even as pared down by *Skilling* – applies"); *cf. Ryan v. United States*, 645 F.3d 913, 918–19 (7th Cir.) (although jury was not charged that honest services fraud is limited to bribery or kickback schemes, a reasonable jury could have convicted on bribery or kickback theory and the inference

---

[9]     If anything, the instructions suggested to the jury that it could *not* find DeMizio guilty merely for steering business to companies that employed his family members. I instructed the jury "that it's not unlawful for the defendant to have helped his brother get a job at Swiss American *or to have caused Morgan Stanley to increase the amount of business it did with Swiss American after his brother became employed there*." Trial Tr. 1376 (emphasis added). While this instruction related to Swiss American rather than the four companies that paid kickbacks, it at least suggested to the jury that merely steering business to a company that employed DeMizio's relatives was not fraudulent.

that its verdict was premised on such a theory "verges on the inescapable"), *petition for cert. filed*, No. 11-499 (U.S. Oct. 19, 2011).  The same conclusion that any *Skilling* error was harmless applies here.[10]

CONCLUSION

For the reasons stated above, the motion for a judgment of acquittal or for a new trial is denied.

So ordered.

John Gleeson, U.S.D.J.

Dated: Brooklyn, New York
       March 26, 2012

---

[10]     Because I conclude the conviction may stand on a theory of honest services fraud, I need not resolve the dispute over the government's alternative argument, *i.e.*, that any *Skilling* error was harmless because the jury's verdict may be upheld on the "traditional" theory of wire fraud or securities fraud.  And because I conclude that no retrial of the conspiracy charge is necessary, I need not address DeMizio's argument that a retrial of the false statement charge is required due to prejudicial spillover.